GEORGE J. BERGEN, receiver, &c.,

*v.*

JOHN I. ROGERS.

[Decided June 6th, 1907.]

1. Where it was understood between a corporation and defendant that, subject to a first mortgage, he should have a lien for money advanced, not to be enforced before October 1st, 1905, unless some other creditor either sued or threatened suit, and June 2d, 1905, the directors authorized such a bond, and defendant drew one payable October 1st, 1905, believing it could be entered any time, upon ascertaining that it could

not be entered until that date, the officers could execute a new bond expressive of the understanding without further authorization from the directors.

2. Evidence *held* insufficient to show a bond was given by a corporation while insolvent or in contemplation of insolvency, within Corporation act (*P. L. 1896 p. 298 ch. 185 § 64*), making conveyance under such circumstances void, or that there was an intent to cheat, defraud or give undue preference.

Heard on bill, answer, replication and proofs.

*Messrs. Wilson, Carr & Stackhouse,* for the complainant.

*Mr. Thomas P. Curley* and *Mr. John I. Rogers* (of the Philadelphia bar), *pro se,* for the defendant.

GARRISON, V. C. (orally).

A man named Hughes, located at Philadelphia, was the promoter of an enterprise which had for its general object the building of a trolley line from Philadelphia to Atlantic City. It was to run from Sixty-third and Market streets, Philadelphia, to a point on the Delaware river opposite a tract of land in Gloucester county, in this state, called "Lincoln park;" the purpose was to transport passengers to this point on the Pennsylvania shore, the point being called "Dupont's farm," thence across or under the Delaware river to Lincoln park, and along an almost straight line projected to Atlantic City, New Jersey. At the Atlantic City end it was intended to purchase a trolley which runs from Atlantic City to Pleasantville and to use its line and terminal for the ending of the route of this projected railroad scheme. The whole scheme was a vast one, involving millions of dollars. As links in the chain, there was to be purchased the Dupont farm, at about $7,500; a tract of land of some thirty or thirty-five acres, which was a disused amusement park on the river-front known as "Lincoln Park;" the rights of way between the last-named place and the Pleasantville terminal of the trolley company above mentioned, and then that trolley line up Florida avenue to the boardwalk in Atlantic City.

Mr. Hughes interested John I. Rogers, of Philadelphia, in this

undertaking, and Rogers was to put in $25,000 to go toward purchasing the trolley line at Atlantic City.

Some negotiations in New York led to the information that at Florida avenue in Atlantic City, at the terminus of this trolley line, the Lincoln Trust Company of New York had purchased a piece of property and contemplated erecting a pier for amusements, and that it was also prepared to purchase the trolley company in connection therewith; whereupon the Lincoln Trust Company became interested in this larger scheme, and it no longer became necessary for Hughes and his associates to expend their ready cash for this Atlantic City Trolley Company. Thereupon Hughes disclosed to Rogers that he, Hughes, had rented the Lincoln park property from the Equitable Trust Company and had an option to purchase it.

This park had been run for several years profitably, and then became unprofitable; the mortgage thereon, some $110,000, was foreclosed by the trustee, the Equitable Trust Company just mentioned, and had been bought in to protect the bondholders. It had been held for several years by the trustee, and finally this lease was made to Hughes for a nominal rent, some $1,800 a year, with the privilege to purchase for $60,000, of which $10,000 was to be cash and $50,000 was to be mortgage.

Part of the general railroad scheme had been to turn in the Lincoln park property to the railroad syndicate at $150,000, making a profit, as between those who turned it in and the railroad company, of $90,000, they having to pay $60,000 for it and getting $150,000 for it.

Rogers, although up to that time believing or understanding that the Hughes corporation, the Lincoln Park Transportation Company, already owned Lincoln park, was, for the first time, advised that this was not so. However, he consented to use the money, which he had intended to use for the purchase of the Atlantic City right, for the new purpose, namely, the purchase of the Dupont farm and the purchase price, in cash, of the Lincoln park property, plus some $5,000 additional which Hughes told him would cover all that had been incurred by way of expense at the park up to that time, making in all $15,000

at that time required, exclusive of the purchase price of the Dupont farm.

In an agreement dated the 24th of April, 1905, this matter is contained, and it was there agreed that Rogers was to advance $15,000, was to take a note at four months therefor, and was to have one thousand seven hundred of the one thousand eight hundred shares paid by the company to Veale as consideration money, and was to hold these one thousand seven hundred shares for himself and Hughes.

The general purpose of all the parties at that time was to hold matters in *statu quo* until the railroad company was incorporated, and then turn in the park property and the Dupont property and get their profit.

The railroad scheme was delayed, and Hughes determined to open the park, and prior to opening the park he had made some improvements, repaired the pier and had done some other work, and had, he said, incurred some $3,000 of expense in so doing. He thereupon went to Rogers and explained that it was not necessary to expend any money at present in the purchase of the Dupont farm, because they had that secured through an option, and that they need not now exercise the option and put up any cash, but that he did need $3,000, which was all, however, that he would need to clear up the situation at Lincoln Park; and he suggested that Colonel Rogers should advance the additional $3,000. This was done, making $18,000 of cash that Colonel Rogers had put into the enterprise, and, on the 2d of June, various contracts were drawn and resolutions were passed by the stockholders and directors of the Lincoln Park Transportation Company which disclosed that the general scheme was as is about to be stated, Rogers not, however, acting as a stockholder, the stock which was to have been transferred to him still standing in the name of the original subscriber, Veale. Veale was the person who had purchased the property and turned it over to the Lincoln Park Transportation Company.

The understanding referred to was that Rogers was to have a lien for the money that he advanced immediately after the first mortgage of $50,000. He was not to enforce his lien until the first of the succeeding October, unless some other creditor either

threatened suit or actually brough suit, in which event he was to exercise his right to collect his money.

The proper officers were duly authorized to execute a bond, with a warrant to confess judgment, in furtherance of the understanding just mentioned. The bond was drawn by Colonel Rogers. He is a Pennsylvania lawyer, and it is the law of Pennsylvania that a bond may be entered at any time, but execution thereon may not issue until after the bond is, by its terms, due. It remains in the meantime, however, as a lien against real estate from the time of entry.

Colonel Rogers, assuming that the law of New Jersey was the same as the law of Pennsylvania, drew a bond for the $18,000, with interest, to the 1st of October, payable on or before October 1st, 1905, and this bond was duly executed by the officers and delivered.

At that time there was not the slightest belief in anybody's mind, excepting Mr. Hughes', that the park was to be operated as a separate entity. It had been theretofore wholly considered as a part of the general scheme. Afterwards Mr. Hughes determined to operate the park. He was the president of the Lincoln Park Transportation Company, and he constituted a man named Morgan general manager, and began operations at the park. The general nature of these operations was to have various amusement devices at the park and to transport people there for a consideration, and make what additional money could be made from them by their patronage of these devices and the restaurant and other things furnished for their entertainment and accommodation.

When first opened the park was not very successful, owing to bad weather, and, perhaps, bad management, excessive outlays for balloon ascensions and bands of music, but subsequently, by cutting out these expensive items, more money came in than went out for operation.

In the latter part of July propositions to lease the park to outside parties were made, and two such offers were considered by Hughes and all the parties interested. Upon these propositions being disclosed to Rogers, he suggested that no lease should be made which was not made in the face of knowledge of his bond—

in other words, that he should enter up his bond and thereby advise the lessee of his encumbrance, and that the rent, instead of being paid to the company, should be paid to Rogers, under an agreement to be drawn, showing the trust relation of Rogers in the matter, his idea being that the rent should go first to pay the mortgage interest, the taxes, the interest on his loan and other like fixed charges, before any should go to the company for its general purposes.

At or about this time, and perhaps in connection with this matter, the bond, for the first time, was exhibited to New Jersey counsel, who immediately advised Colonel Rogers that it could not be entered up, under the laws of New Jersey, before October 1st; Colonel Rogers thereupon, on the 26th of July, advised Mr. Hughes of this, and it was immediately agreed by all parties that this was not expressive of the agreement of June 2d that it was the clear understanding that Mr. Rogers was to have a bond which could be entered up at any time, execution thereon not to be issued, however, unless suit was threatened or brought by somebody else; that he was to be secured by having a lien next to the mortgage, and that the company and its present officers would, of course, execute a bond in reformation of the bond of June 2d.

Colonel Rogers suggested the necessity or desirability, at least, of having an authorization by the board of directors of this new bond. He was told by Hughes that this was not necessary, but he persisted and Hughes consented. Two out of three members of the board (three being a quorum) attended on the morning that the bond was to be executed, July 28th, 1905, but the third member did not appear, and no meeting was ever held of the board, and no actual authorization by the board of any new bond was ever had at a meeting. The minutes of a meeting evidencing authorization were drawn by Colonel Rogers in the office of the company on the morning of the 28th of July, and, undoubtedly, the two members who were there assented; but it cannot be held, in view of our decisions, that the board of directors, as such, ever authorized this bond of July 28th. Whether or not the company ratified it by subsequent action I do not propose to consider, because I hold that the officers were

authorized to execute this bond by the resolution of the board passed on the 2d of June, 1905, that they only did on the 28th of July what they had been previously authorized to do; that they only did that which a court of conscience would have required them to have done, and that what they then did was done as of the 2d day of June, and that there was no fraud, no intention to cheat or defraud anybody, and no intention at that time to give any undue preference as of that time.

There is no doubt in my mind that Mr. Hughes is mistaken in his testimony that Colonel Rogers at that time had any knowledge of the general indebtedness of the company. The only knowledge that he is shown to have had was of the unpaid interest money due the Equitable Trust Company shortly before this time, or about this time, and, perhaps, some taxes. I do not think that there is any proof that Rogers had any knowledge of any other indebtedness of the company. He undoubtedly assumed that in the course of operation there were, at times, unpaid sums of money, but he believed, and I think was justified in believing, that these were the slight items which occur in any business enterprise, and had no reason to believe that they were large. He had every reason to believe, from what he had been told, that his money had paid all the large items for improvements, &c.

It is a fact that at that time the company had no ready money excepting such as was coming in from day to day from the operation of the park, and it is also proved that, by reason of Hughes' management, he was not able readily to obtain boats. But it is not at all clear, in view of the decisions in this state, that the company was insolvent within the meaning of the sixty-fourth section of the Corporation act. (*P. L. 1896 p. 298 ch. 185.*) Certainly there was no contemplation of insolvency, because the testimony of every witness is that they did not contemplate insolvency at that time. They were planning to run boats away into October, had numerous engagements for picnics and excursions, which were profitable to them, through the months of August and September, and had every prospect, so far as exceeding the operating expenses by the income was concerned, of a good season in that regard. Whether or not the net result

would have been sufficient to have paid off the floating debt which subsequently was shown to have existed at that time must be left to conjecture.

On the afternoon of the same day that this bond was given to Colonel Rogers, July 28th, he was brought in contact with one Thompson. Thompson was one of the parties heretofore spoken of who was seeking to lease the property. The other parties were referred to as "The Allentown people." In Hughes' view it was better to deal with Thompson than with the Allentown people, because the Allentown people merely wanted to rent for five years at a set rental, whereas he hoped that with Thompson he could effectuate a sale and thereby get rid of the park and pay all of the debts and make the profit which they intended to make out of the park property, not by its operation but by its sale, because all that they wanted of the park in their original undertaking was to use part of it as a terminal for the railroad, and in all of their talk of leasing or selling it was definitely understood that an easement should be reserved by the company permitting the erection of terminals and the laying of tracks, &c., through the property.

This meeting with Thompson took place on the 28th of July, and another meeting took place on the 1st of August. At this last meeting it was, for the first time, disclosed by Mr. Hughes to Mr. Rogers that there existed a large amount of floating indebtedness—I call it "floating indebtedness"—I mean indebtedness contracted by him in the management of the park property from about the 1st of July when the park was opened.

The bond dated July 28th was sent by Colonel Rogers to his New Jersey attorney with instructions to enter the same, but not to issue execution without further instructions. The attorney, on the 31st of July, entered judgment on the bond, and, being informed on the next day by the clerk of Gloucester county, where the bond was entered, that a suit had been begun by one Horner for some two hundred odd dollars against the company, conceived that this was a situation in which he must protect the interests of his client, and, without consultation with Rogers, he instructed execution to be issued, and then left town for a vacation.

This execution was issued on the 1st of August, or, perhaps, the 2d. The next day, when Colonel Rogers learned of it, as he did by a letter from his attorney, he immediately, upon ascertaining that the attorney was away on a vacation, instructed the sheriff to hold the execution and not to make a levy, and no levy was actually made for several weeks.

In the meantime the various schemes to lease fell through and the attempts to borrow further moneys also fell through—I mean attempts to borrow by increasing the amount of mortgage—and the boat which they had been using was no longer obtainable by them without ready money, and the company, on a bill filed on the 16th day of October, 1905, at the suit of H. W. Johns Mandeville Company, complainant, was adjudged insolvent and an injunction was issued and a receiver appointed.

The bill in this suit to set aside the judgment of Colonel Rogers was filed on October 30th, 1905.

Finding, as I do, that the debt is an honest one, that the intention of the parties on the 2d of June was to give a bond which might be entered at any time but no execution to issue until suit was threatened or begun, that the action of July 28th was authorized by the company and related back to June 2d in effect, I find there was no fraud and no contravention of the provisions of section 64 of the statute; and, furthermore, I do not find that the complainant has borne the burden of showing that this corporation was insolvent, or that the bond was given in contemplation of insolvency on the 28th of July, within the definition and meaning attributed to this language by our courts in dealing with it. *Cogan* v. *Conover Manufacturing Co., 69 N. J. Eq. (3 Robb.) 815 (Court of Errors and Appeals, 1905)*.

I, of course, do not, in this case, deal with any questions arising out of the fact that Rogers is a stockholder of the company. If that stock was not paid for in full, or if, as a stockholder, he is under any liability because he holds stock which is still assessable for creditors, those rights must be worked out in the insolvency case. Before he can obtain any benefit of this judgment as against the receiver, or the assets in the receiver's hands (the property having been sold and the lien transferred to the assets), he must, of course, petition in that proceeding. When he does

so petition any rights that the receiver has on·behalf of creditors to assess Rogers on the stock, or to hold him liable in any way because of the fact that he is a stockholder, may. be dealt with, and the rights of the receiver protected.

I merely hold in this action that the receiver has not shown that this bond was unauthorized, or that it was given in contemplation of insolvency, or that the company was insolvent within the meaning of the sixty-fourth section of the statute, and has not, therefore, shown that the judgment should be set aside.

I will advise a decree dismissing the bill.